UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| ALLEN S. HEUSNER,<br><br>　　　　Petitioner,<br><br>v.<br><br>WILLIAM HUTCHINGS, *et al.*,<br><br>　　　　Respondents. | Case No. 2:14-cv-01119-RFB-GWF<br><br>**MERITS ORDER** |

Before the Court, for a decision on the merits, is a second amended petition for a writ of habeas corpus (ECF No. 44), which was filed by Allen S. Heusner: a Nevada prisoner. For the reasons discussed below, the Court denies the petition.

**I.　　BACKGROUND[1]**

After a trial in the Eighth Judicial District Court for Nevada, a jury found Heusner guilty of: burglary while in possession of a deadly weapon, invasion of a home while in possession of a deadly weapon, first-degree murder with use of a deadly weapon, and first-degree arson. Evidence presented at trial established the following basic facts. In violation of a temporary protective order (TPO), Heusner went to the home of his estranged wife, Tiffany, just after midnight on June 13, 2007. Angered by finding an unfamiliar car in the driveway and seeing only the master bathroom light on, Heusner drove to Walmart and bought a baseball bat. After returning to the home and using the bat to break through a glass living room door, he confronted Tiffany's guest, Michael Clark. Heusner struck Clark with the bat at least 20 times, including at

---

[1] The information in this section is drawn from the state court record—which is filed at ECF Nos. 26, 53, 62, 63, and 64—and this Court's own docket.

least 12 times to the head. Heusner also turned on all the stove burners and lit a blanket on fire. Clark died as a result of his injuries.

The court sentenced Heusner to consecutive terms of twenty-years-to-life for murder with use of a deadly weapon and various other terms on the remaining counts. A judgment of conviction was entered in June 2008. Heusner appealed.

In May 2010, the Nevada Supreme Court entered an order affirming Heusner's judgment of conviction. In June 2011, Heusner filed, *pro se*, a habeas corpus petition in the state district court. He subsequently filed a supplement to the petition with the assistance of appointed counsel. After an evidentiary hearing and additional briefing, the court entered a decision denying relief. Heusner appealed. The Nevada Supreme Court affirmed the lower court's decision and issued a remittitur in December 2013.

In February 2014, Heusner filed another state habeas petition in the district court. That petition was denied because his allegations involved the conditions of his confinement and not the validity of his confinement. The Nevada Supreme Court denied Heusner's appeal because his claims were not cognizable in a petition for a writ of habeas corpus.

Heusner initiated this federal proceeding in July 2014. After resolving payment of the filing fee, this Court directed Heusner to show cause why his petition should not be dismissed as untimely. While awaiting the Court's decision on his response, Heusner filed his third state habeas petition in the district court in December 2015. The state district court dismissed the petition as procedurally barred, and the Nevada Court of Appeals affirmed.

In 2017, this Court determined that Heusner was entitled to equitable tolling with respect to his federal petition and issued a scheduling order. When Heusner filed a statement of additional claims, the Court directed him to file an amended petition, which he did in August 2017. After screening the petition, the Court dismissed three grounds and ordered Respondents to respond to Heusner's remaining claims. Respondents filed a motion to dismiss raising timeliness and lack-of-exhaustion defenses. The Court rejected the former but agreed that Heusner's petition contained several unexhausted claims.

1    Prior to this Court's ruling on the motion to dismiss, Heusner had filed, *pro se*, a petition for a writ of mandamus in the state district court, which the court denied as untimely, successive, and without merit. The Nevada Court of Appeals subsequently affirmed the lower court's decision.

In April 2018, Heusner filed his fifth state petition in the district court. Once again, the state district court dismissed the petition as procedurally barred, and the Nevada Court of Appeals affirmed.

In May 2019, Heusner filed, with the assistance of appointed counsel, a second amended federal petition containing seven grounds for relief. He also filed a motion for stay and abeyance so he could present a claim based on McCoy v. Louisiana, 584 U.S. 414 (2018), to the state courts. This Court granted the motion. Proceedings on Heusner's state petition concluded with the Nevada Supreme Court deciding that McCoy is distinguishable from Heusner's case and declining to resolve Heusner's argument that McCoy applies retroactively. The Nevada Supreme Court's remittitur issued on April 5, 2021.

In July 2021, this Court granted Heusner's motion to reopen federal proceedings. In January 2022, Respondents filed a motion to dismiss the second amended petition. Granting the motion, in part, the Court dismissed Grounds 3, 4, 5, and 6 from the petition. The Court now addresses Heusner's remaining claims: Grounds 1, 2, and 7.

## II.    STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The standard of review under AEDPA is set forth at 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. See Williams v. Taylor, 529 U.S. 362, 405–406 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'" Renico v. Lett, 559 U.S. 766, 773 (2010) (quoting Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997); Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)); see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (quotation marks and citations omitted).

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." Taylor v. Maddox, 366 F.3d 992, 999 (9th Cir. 2004), overruled on other

4

grounds by Cullen v. Pinholster, 563 U.S. 170, 185 (2011); see also Miller-El, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

### III.   DISCUSSION

#### A.  Ground 1

In Ground 1, Heusner alleges that the State committed multiple acts of prosecutorial misconduct which, taken together, violated his constitutional rights to due process and a fair trial. He contends that the prosecutor improperly disparaged him during cross-examination and during closing arguments. He also claims that the prosecutor shifted the burden of proof to the defense and injected her personal opinion.

##### 1.  Heusner's testimony.

Heusner testified in his own defense at trial. To provide context for the Court's analysis of Heusner's claims of prosecutorial misconduct, here is a summary of his testimony on direct examination.

Heusner and Tiffany were married in August 2004. See ECF No. 26-34 at 6. By the summer of 2006, problems with the marriage prompted them to see a marriage counselor. See id. In the spring of 2007, he began sleeping in a separate room because he was upset that Tiffany wanted a divorce but did not "give a good enough reason." Id. at 7. Because they been going to counseling and had just signed a lease to rent a house, a divorce felt "too sudden" to him and he suspected that "there was something else going on." Id. After seeing that she had been having long conversations with a particular person identified as "Prince" on her phone, he asked Tiffany if she was seeing someone else. See id. She claimed it was "just a friend from work." ECF No. 26-34. Whenever he asked her if she was involved with another man, Tiffany would deny it. See id. at 8.

Soon thereafter, Tiffany served Heusner with a TPO that required him to be out of the house for 30 days. See id. His reason for going by the house on the night of the murder was to

1  check if his mail had been accumulating in the mailbox. See id. at 10. He had ordered a battery
2  for his laptop on Ebay and did not know whether the seller would be able to send it to any other
3  address. See id. at 9. When he noticed a strange car with a still-warm engine in the driveway, he
4  went into the backyard where he was able to see that the only light on in the house was the
5  bathroom light. See ECF No. 26-34 at 10. At that point, he became "quite angry and emotional
6  because it [was] obvious what was going on, even though [he] didn't know who the car had
7  belonged to." Id.

8  Unsure of who or what he would encounter if he tried to enter the house, he went to
9  Walmart where he bought a baseball bat, some wine, Chapstick, and a bottle of cleaner. See id. at
10  10–11. He bought the bat for protection in case there was a confrontation with whoever was in
11  the house. See id. at 11. Though he contemplated whether to return to the house, his emotions
12  became so overwhelming that he just had to find out what was going on. See id. Specifically, he
13  "wanted to catch them in the act." ECF No. 26-34 at 11.

14  When he returned to the house, he discovered that the locks had been changed, so he used
15  the bat to smash through a glass door. See id. As he walked through the house, the man he later
16  learned was Michael emerged, said something to him, and then charged at him, with both of
17  them falling by the sliding glass door in the master bedroom. See id. He panicked and started
18  hitting Michael with the bat. See id. He kept hitting him and also noticed that Tiffany was either
19  naked or wearing a towel, which confirmed his suspicions. See id. at 12. He tried to walk out, but
20  instead of leaving, he came back through the house. See ECF No. 26-34 at 12. When Michael ran
21  at him again, he hit Michael again. See id. Feeling terrible about what had happened, he started
22  to drive away but realized he had nowhere to go. See id. So he returned to the house where he
23  tried to commit suicide by drinking the wine and the cleaner. See id. He put the blanket on the
24  stove and turned the stove on because he was angry after seeing pictures of Michael and Tiffany
25  on the entertainment center. See id.
26  ///
27  ///
28

**2. Alleged misconduct on cross-examination.**

The prosecutor began her cross-examination of this testimony by confirming that Heusner's two-and-half year marriage to Tiffany was beset with problems. See ECF No. 26-34 at 13. Then the cross-examination proceeded as follows:

> Q: And she made it very clear that she no longer wanted to be married to you?
>
> A: I couldn't.
>
> Q: But you just didn't think she had a good enough reason.
>
> A: Yes.
>
> Q. So she owed you an explanation [about why she wanted a divorce] and you're the one to determine whether her explanation is good enough for you?
>
> [Defense counsel]: Objection. Argumentative, your Honor.
>
> THE COURT: Sustained.
>
> Q: So just, you didn't like her reason?
>
> A: Her reason didn't make sense.
>
> Q: And it has to make sense to you?
>
> A: It had to make sense overall, that's the way I would put it.
>
> Q. So if somebody doesn't want to be married, it is for you to say whether they have the right to get out or not?
>
> [Defense counsel]: Objection. Argumentative.
>
> THE COURT: Sustained.

Id. at 13-14.

Then, later in the cross-examination, the following exchange occurred:

> Q. So if somebody went into a residence where a husband and wife had once lived, they kind of deserve what happens to them?
>
> [Defense counsel]: Objection. Argumentative, your Honor.
>
> [Prosecutor]: I'm just trying to clarify what he said.
>
> [Defense counsel]: She is not clarifying it. She is phrasing it the way she wants it to be phrased.
>
> THE COURT: I'm going to sustain the objection and ask you to rephrase the question.

7

Id. at 17.

Based on the foregoing, Heusner claims that the prosecutor "improperly badgered and harassed [him] . . . by asking repetitive and inflammatory questions attacking [his] character and blatantly ignored the court's ruling on defense counsel's objections." ECF No. 107 at 11–12. He further claims that the prosecutor also disparaged him in closing arguments by arguing: "We're in his world and anyone who tries to interfere with his marriage will suffer the [w]rath." ECF No. 26-32 at 19.

### 3. Alleged misconduct by shifting burden of proof and injecting personal opinion.

Heusner claims that the prosecutor improperly suggested the defense had a burden to establish that he attempted to kill himself and then injected her personal opinion by making the following comments during closing argument:

> Now, with regard to this alleged suicide attempt. I would submit there was no suicide attempt. If he had really drunk a bottle of Draino or draining cleaner, he probably would [have] shown some symptoms. Remember, the police were with him for hours. He never threw up, never did anything. Wow, that's pretty amazing. Never injured, never went to the hospital. No after effects. So I guess we can all drink a bottle of Draino and nothing will happen to us.

And,

> I think the suicide is an attempt to pla[y on] your sympathy to again portray himself as the victim and to take your eyes off the true victim in this case, Michael Clark.

Id. at 22.

### 4. Analysis.

Heusner cites Darden v. Wainwright, 477 U.S. 168 (1986), as support for his claim that the prosecutor's misconduct entitles him to habeas relief. See ECF No. 44 at 10. In Darden, the Court held that "it 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" Darden, 477 U.S. at 181 (quoting Darden v. Wainwright, 699 F.2d 1031, 1036 (11th Cir. 1983). Instead, on federal habeas review, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process.'" Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

Here, the Nevada Supreme Court concluded that the prosecutor's questions were improper, but that they "were not disparaging or harassing" when considered in context. See ECF No. 26-52 at 9. The court further noted that the trial court sustained the defense's objections and Heusner did not answer the questions. See id. at 9–10. Accordingly, the court held that any error was harmless and did not warrant reversal. See id. at 10.

With respect to the prosecutor's comments about Heusner's alleged suicide attempt, the Nevada Supreme Court found them improper because a prosecutor is not permitted to comment on a defendant's failure to present witnesses. See id. at 12. Once again, however, the court concluded the Heusner had failed to demonstrate sufficient prejudice to warrant reversal. See id.

This Court must defer to the Nevada Supreme Court's rejection of Heusner's prosecutorial misconduct claims unless Heusner can show that the ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Heusner has not met that burden. Even if improper, the conduct he cites was relatively innocuous compared to the misconduct in Darden that the Court determined was improper but still not sufficiently prejudicial to warrant habeas relief. See Darden, 477 U.S. at 180 n.11 (prosecutor referred to the defendant as an "animal"); id. at 180 n.12 ("I wish I could see [the defendant] with no face, blown away by a shotgun."). In addition, substantial evidence supported a finding of Heusner's guilt on all charges. See id. at 182 (reasoning that overwhelming evidence "reduced the likelihood that the jury's decision was influenced by" the prosecutor's misconduct). Thus, Ground 1 is denied.

**B. Ground 2**

In Ground 2, Heusner alleges that the admission of testimony regarding his invocation of his right to remain silent violated his constitutional rights.

**1. Testimony allegedly implicating Heusner's right to remain silent.**

9

Heusner points to testimony from police officers describing his post-arrest conduct and his own testimony on cross-examination in response to a question about his suicide attempt.

Michael Farage of the North Las Vegas Police Department testified as follows:

Q. Did you advise [Heusner] of his Miranda rights?

A. Yes, I did.

. . . .

Q. Okay. And what was his reaction to you reading them?

[Defense counsel]: Objection, and ask to approach, Your Honor.

THE COURT: Sure.

(Thereupon, a brief discussion was held at the bench).

THE COURT: I'm going to sustain the objection to that question.

ECF No. 26-31 at 25.

The prosecutor then asked Farage whether Heusner "inquire[d] as to the victim's condition," to which Farage responded in the negative. See id. Later in his testimony, Farage stated that Heusner "didn't want to deal with the police" and was "defiant." Id.

Michael Loyd, another officer with the North Las Vegas Police Department, testified that Heusner "didn't have any remorse . . . for what was going on . . . ." Id. at 30–31. The court sustained defense counsel's objection to that testimony and ordered that it be stricken and disregarded by the jury. See id. at 31. Then, during Heusner's cross-examination, the prosecutor questioned Heusner about his suicide attempt:

Q. You never told anyone until today?

A. What do you mean?

[Defense counsel]: Objection. I ask to approach.

(A nonreported sidebar conference was held)

THE COURT: I'm going to sustain the objection. I am going to ask the jury to disregard the last question and the last answer. I am going to order it stricken.

ECF No. 26-34 at 25.

**2. Analysis.**

Heusner argues that the Nevada Supreme Court correctly concluded that the comments on his post-arrest silence were improper but that the court's decision that any error was harmless was based on an unreasonable determination of the facts. The court concluded that the police officer's comments were "harmless beyond a reasonable doubt for two reasons: (1) the district court sustained the defense's objections when made and ordered one of the statements stricken from the record, and (2) overwhelming evidence supports Heusner's convictions." ECF No. 26-52 at 13 (citation omitted). Similarly, the court concluded that the prosecutor's question about Heusner's suicide attempt was also harmless beyond a reasonable doubt "because the district court sustained the objection, instructed the jury to disregard the objected-to answer and question and ordered them stricken from the record, and Heusner's convictions are supported by overwhelming evidence." Id. at 14.

The Nevada Supreme Court's harmless error determination was a merits decision for section 2254(d)(1) purposes. See Davis v. Ayala, 576 U.S. 257, 269 (2015) ("There is no dispute that the California Supreme Court held that any federal error was harmless beyond a reasonable doubt under Chapman, and this decision undoubtedly constitutes an adjudication of Ayala's constitutional claim 'on the merits.'") (citation omitted); see also Brown v. Davenport, 596 U.S. 118, 127 (2022) ("No one questions that a state court's harmless-error determination qualifies as an adjudication on the merits under AEDPA.") (citations omitted). In addition, federal habeas petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice'" under Brecht v. Abrahamson, 507 U.S. 619 (1993). Under Brecht, "relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." Ayala, 576 U.S. at 267–68 (quotation marks and citation omitted). In other words,"[t]here must be more than a 'reasonable possibility' that the error was harmful," because "a 'State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error.'" Id. at 268 (citation omitted). The Ayala Court clarified that Brecht

1  "subsumes" the requirements of AEDPA. See id. at 270. Thus, if a state court has determined
2  that a trial error was harmless, then "'a federal court may not award habeas relief under § 2254
3  unless the harmlessness determination itself was unreasonable.'" Id. (quoting Fry v. Pliler, 551
4  U.S. 112, 119 (2007)).

  Under these standards, Heusner has not met his burden under § 2254(d) because the Nevada Supreme Court's harmless error decision was not objectively unreasonable. He argues that the jury most likely found him guilty of first-degree murder under a felony murder theory but that there was not overwhelming evidence of burglary—i.e., that he entered the house with the intent to commit battery or assault. His argument ignores that the jury's finding that he was guilty of invasion of the home was also sufficient to support a finding of first-degree murder under a felony murder theory. See NEV. REV. STAT. § 200.030(1)(b); ECF No. 26-33 at 24 (jury instruction on the felony murder rule). That point aside, this Court is not convinced that the Nevada Supreme Court's harmless error determination with respect to the burglary conviction was unreasonable.

  In Nevada, assault includes "intentionally placing another person in reasonable apprehension of immediate bodily harm." NEV. REV. STAT. § 200.471. The jury was instructed that Heusner's intention upon entering the home is a question of fact "that may be inferred from the Defendant's conduct and all other circumstances disclosed by the evidence." ECF No. 26-33 at 10. Heusner's own testimony was that "it was obvious what was going on" between Tiffany and whoever was in the house and that "he wanted to catch them in the act." ECF No. 26-34. He also admitted that, after returning from Walmart, he parked his car down the street from Tiffany's house to create an element of surprise. See id at 19. He further testified that he hopped over a six-foot wall to get into the backyard and, when his key did not work, he used the baseball bat he had just purchased to open the back door. See id. The undisputed testimony of the medical examiner who conducted Michael's autopsy was that Heusner struck Michael in the head with the bat at least twelve times. See ECF No. 26-31 at 19.

In light of this evidence, there is not more than a reasonable possibility that the improper references to Heusner's post-arrest silence, which were relatively subtle, impacted the jury's decision to find him guilty of burglary. Put another way, there was ample evidence aside from the improper references for the jury to infer that Heusner entered Tiffany's house with the intention of placing another person in reasonable apprehension of bodily harm. Thus, the Nevada Supreme Court's finding that any error was harmless was not objectively unreasonable under the aforementioned section 2254(d) standards. Accordingly, the state court's decision rejecting Heusner's claim must be accorded deference under section 2254(d), and Ground 2 must be denied.

### C. Ground 7

In Ground 7, Heusner alleges that he is entitled to habeas relief because of the cumulative effect of errors alleged above. On direct appeal, the Nevada Supreme Court rejected Heusner's cumulative error claim, which included the errors at issue here, by concluding "that any error in this case, when considered either individually or cumulatively, does not warrant relief." ECF No. 26-52 at 21. Heusner does explain how this conclusion was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. See Williams v. Anderson, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue."). And, for reasons discussed above, the Nevada Supreme Court's decision was not based on an unreasonable determination of the facts. Thus, Ground 7 is denied.

### IV. CONCLUSION

For the reasons set forth above, Heusner's petition for habeas relief is denied.

<u>Certificate of Appealability</u>

This is a final order adverse to a habeas petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for

suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d 851, 864–65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 & 893 n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. See id.

Having reviewed its own determinations and its own rulings in adjudicating Heusner's petition, the Court declines to issue a certificate of appealability for the resolution of any procedural issues or any of Heusner's habeas claims.

Therefore, **IT IS HEREBY ORDERED** that Heusner's second amended petition for writ of habeas corpus (ECF No. 44) is **DENIED**. The Clerk shall enter judgment accordingly and close this case.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED**.

**DATED:** November 4, 2025.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**